## STATE OF CONNECTICUT *v.* MICHAEL WATSON
## (SC 15924)

Borden, Berdon, Palmer, McDonald and Peters, Js.*

Argued March 23—officially released November 30, 1999

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett*, assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Gerard P. Eisenman*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Following a jury trial, the defendant, Michael Watson, was convicted of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4).[1] In a subsequent but related proceeding, the trial court found the defendant to be a persistent

---

[1] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

General Statutes § 53a-133 defines robbery as follows: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling

dangerous felony offender under General Statutes (Rev. to 1993) § 53a-40, as amended by Public Acts 1994, No. 94-37, § 1.[2] After the trial court rendered judgment sentencing the defendant to a total effective term of thirty years imprisonment, the defendant appealed and the Appellate Court affirmed his convictions.[3] *State* v. *Watson*, 47 Conn. App. 794, 809, 707 A.2d 1278 (1998). We granted the defendant's petition for certification limited to the following two issues: "(1) Did the Appellate Court properly uphold the trial court's instruction that the reasonable doubt standard and the presumption

the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[2] General Statutes (Rev. to 1993) § 53a-40, as amended by Public Acts 1994, No. 94-37, § 1, provides in relevant part: "(a) A persistent dangerous felony offender is a person who (1) stands convicted of manslaughter, arson, kidnapping, sexual assault in the first or third degree, aggravated sexual assault in the first degree, sexual assault in the third degree with a firearm, robbery in the first or second degree, or assault in the first degree, and (2) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution, for any of the following crimes: (A) The crimes enumerated in subdivision (1) of this subsection . . . .

\* \* \*

"(f) When any person has been found to be a persistent dangerous felony offender, and the court is of the opinion that his history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest, the court, in lieu of imposing the sentence of imprisonment authorized by section 53a-35 for the crime of which such person presently stands convicted, or authorized by section 53a-35a if the crime of which such person presently stands convicted was committed on or after July 1, 1981, shall sentence such person to a term of imprisonment of not more than forty years and, if such person has, at separate times prior to the commission of the present crime, been twice convicted of and imprisoned for any of the crimes enumerated in subdivision (2) of subsection (a) of this section, sentence such person to a term of imprisonment of not more than life. . . ."

The defendant previously had been convicted of robbery in the second degree.

[3] The defendant originally appealed to this court. We transferred the appeal to the Appellate Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

of innocence are 'designed to protect the innocent and not the guilty' . . . [and] (2) [d]id the Appellate Court properly conclude that the trial court properly permitted the state to cross-examine the defendant's alibi witness regarding her failure to report the alibi to the proper authorities?" *State* v. *Watson*, 244 Conn. 928, 711 A.2d 729 (1998). We answer both of these issues in the affirmative and, consequently, affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "On the evening of December 17, 1994, Elaine Jackson and Christina Ramirez were employed at a sandwich shop in Bridgeport. At approximately 11 p.m., the defendant entered the store and asked for a soda. Ramirez waited on the defendant. He inquired about a telephone, and Ramirez indicated that there was one on the street corner. The defendant then displayed a gun and demanded money from Ramirez, who was standing next to the cash register. Ramirez called to Jackson, who observed the gun pointed at Ramirez. [Ramirez and Jackson] were behind a floor-to-ceiling partition that had an opening through which customers received their orders. The defendant kept the gun pointed at Ramirez and repeatedly demanded money. The defendant took the money that Ramirez removed from the cash register. He then pointed the gun at Jackson and demanded that she open the door leading to the rear of the store. Apparently unable to exit the store from the rear, he ordered [Ramirez and Jackson] to lie face down on the floor and to count to ten before moving. He left [through] the front door, and [Ramirez and Jackson] then notified the police and the store supervisor.

"[Ramirez and Jackson] described the defendant as a Hispanic male, five feet, five inches tall, who spoke broken English, had a gauze bandage over one eye and was wearing a red and black flannel jacket. Ramirez

[and Jackson separately] selected the defendant's photograph from a photographic array of eight males as being that of the perpetrator. The defendant was thereafter arrested.

"At trial, the defendant presented an alibi defense that on the evening of December 17, 1994, he was attending a Christmas party at a club in Stratford with . . . Lisa Cabral, who [was his fiancee at that time]. Cabral testified that she was with him from shortly before 9:30 p.m. until after 12:15 a.m. She testified that the defendant had no accent or injury to his face. Two other witnesses testified that the defendant was at the party and that he had no accent and no injury to, or bandage on, his eye." *State* v. *Watson,* supra, 47 Conn. App. 796–97.

The defendant claimed in the Appellate Court that "the trial court improperly (1) permitted cross-examination of an alibi witness about her failure to report the alibi, (2) denied the defendant's motion for a mistrial, which he based on a reference by the prosecutor to his incarceration, (3) failed to inquire about a possible conflict of interest of defense counsel, (4) failed to find ineffective assistance of counsel, and (5) refused to permit the defendant to demonstrate his voice without being forced to testify." Id., 795. The Appellate Court rejected these claims. See generally id., 797–809. In addition, the Appellate Court, in another published opinion; *State* v. *Watson,* 47 Conn. App. 771, 706 A.2d 1368 (1998); denied the defendant's motion for permission to file a supplemental brief challenging the trial court's instruction to the jury that the reasonable doubt standard and the presumption of innocence are rules "designed to protect the innocent and not the guilty."[4] (Internal quotation marks omitted.) Id., 772.

---

[4] As the Appellate Court noted, the defendant filed his motion for permission to submit a supplemental brief "in light of *United States* v. *Doyle,* 130 F.3d 523 (2d Cir. 1997)." *State* v. *Watson,* supra, 47 Conn. App. 771. "In *Doyle,* the defendants appealed from a judgment of conviction, arguing that the [federal] District Court committed reversible error when it instructed the jury that the reasonable doubt standard and the presumption of inno-

We granted certification to determine whether the Appellate Court properly rejected the defendant's claims that the trial court improperly: (1) instructed the jury on reasonable doubt and the presumption of innocence; and (2) permitted the state to cross-examine Cabral, a defense witness, regarding her failure to notify either the police or the prosecuting authorities about her alibi story. We affirm the judgment of the Appellate Court.

I

We first consider the defendant's claim that the trial court improperly instructed the jury that the principles of reasonable doubt and the presumption of innocence are designed "to protect the innocent and not the guilty." Specifically, the defendant contends that this instruction "impermissibly diluted both the presumption of innocence and the reasonable doubt standard in violation of [his] federal and state[5] constitutional guarantees of due process[6] and a jury trial."[7] Because

cence were rules 'designed to protect the innocent and not the guilty.' [*United States* v. *Doyle*, supra,] 533. The United States Court of Appeals for the Second Circuit agreed with the defendants [in *Doyle*] and held that such a jury charge 'incorrectly states both the reasonable doubt standard and the presumption of innocence.' Id., 538." *State* v. *Watson*, supra, 772. In recognition of the fact that this court consistently had approved such jury instructions, and noting that the Appellate Court is bound by decisions of this court and not the decisions of the United States Courts of Appeals, the Appellate Court denied the defendant's motion because "the issue that the defendant [sought] to brief would not [have] affect[ed] [its] decision in [that] case." Id.

[5] Because the defendant has failed to provide an independent analysis of his state constitutional claims, we limit our review to the defendant's claims under the federal constitution. E.g., *State* v. *Beltran*, 246 Conn. 268, 277 n.7, 717 A.2d 168 (1998).

[6] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[7] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." The sixth amendment right to a jury trial is made applicable to the states through the fourteenth

the defendant did not object to this instruction at trial, we consider his claim under the standard that we adopted in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), regarding unpreserved constitutional claims.

In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. Because the record is adequate for our review of the defendant's claim, we address the merits of the claim.

Our resolution of the defendant's claim is governed by this court's unanimous en banc decision in *State* v. *Schiappa*, 248 Conn. 132, 167–77, 728 A.2d 466 (1999). As we recently stated in *State* v. *Delvalle*, 250 Conn. 466, 736 A.2d 125 (1999): "In *Schiappa*, we addressed a challenge to instructional language virtually identical to that used by the trial court in [*Delvalle*]. . . . 'Now . . . the state does not desire the conviction of an innocent person or any person whose guilt upon the evidence is in the realm of reasonable doubt. The state has as much concern in having an innocent person acquitted as in having a guilty person punished. But for the safety and well-being of all persons of the state, for the protection of life and property, the state, of course, is concerned in securing the conviction of persons who

amendment due process clause. *Duncan* v. *Louisiana*, 391 U.S. 145, 149, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968); see footnote 6 of this opinion.

have been proven by the evidence to have been guilty of committing . . . the crime or crimes charged beyond a reasonable doubt.

" 'It is the sworn duty of the court and the jurors to safeguard the rights of persons charged with crimes by respecting the presumption of innocence which the law imputes to every person so charged by making the state meet its burden of proof of guilt beyond a reasonable doubt. *But you must keep in mind that this rule of law is made to protect the innocent and not the guilty.* If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that the accused is guilty of the crime or crimes charged, then it is the sworn duty of the jury to enforce the law and to render such verdicts.' . . .[8]

"In rejecting the defendant's claim in *Schiappa*, we relied on the fact that, as in [*Delvalle*], the 'challenged portion of the instruction was immediately preceded by language underscoring the presumption of innocence and the state's burden of proof'; [*State* v. *Schiappa*, supra, 248 Conn.] 172; and that 'the allegedly improper language was immediately followed by an instruction that again emphasizes these two critical constitutional principles . . . .' Id. We also observed in *Schiappa* that the trial court, both in its preliminary instructions prior to trial and in its final instructions to the jury at the conclusion of the trial, had 'repeatedly apprised the jury [in clear and legally correct terms] regarding the presumption of innocence and the state's burden of establishing guilt beyond a reasonable doubt.' Id. As in *Schiappa*, the trial court in [*Delvalle*] repeatedly and accurately explained those principles in its

---

[8] The challenged language in the present case is identical in all material respects to the language of the instructions at issue in both *Schiappa* and *Delvalle*, and, as in those cases, was preceded and followed by language emphasizing the presumption of innocence and the state's burden of proof.

preliminary and final instructions to the jury. [*Delvalle*], therefore, is indistinguishable from *Schiappa*.

"The defendant has provided no persuasive reason why we should reconsider our determination of this issue in *Schiappa*. Accordingly, we conclude, as we did in *Schiappa*, that 'the trial court's charge, when viewed in its entirety, adequately apprised the jury that the defendant was entitled to a presumption of innocence unless and until the state proved [him] guilty beyond a reasonable doubt.' Id., 173."[9] (Citation omitted; emphasis in original.) *State* v. *Delvalle*, supra, 250 Conn. 471–72. In the absence of any reasonable possibility of juror confusion over the challenged instructional language in the present case, which is identical in all material respects to the challenged instructional language in both *Schiappa* and *Delvalle*; see footnote 8 of this opinion and accompanying text; we reject the defendant's constitutional claims.

II

The defendant also claims that the trial court improperly permitted the prosecutor to cross-examine Cabral, the defendant's wife at the time of trial and one of his alibi witnesses, regarding her failure to report her alibi story to either the police or the prosecuting authorities. The defendant further contends that, under the circumstances of this case, the prosecutor's cross-examination

---

[9] "Although, in *Schiappa*, we rejected the defendant's constitutional claim, we also acknowledged that '[b]ecause the guilty as well as the innocent are entitled to the protections afforded by the presumption of innocence and the reasonable doubt standard, the challenged portion of the charge, when viewed in isolation, gives rise to a danger of juror misunderstanding.' *State* v. *Schiappa*, supra, 248 Conn. 175. We, therefore, exercised our supervisory authority over the administration of justice to direct our trial courts to refrain from using such language in future cases." *State* v. *Delvalle*, supra, 250 Conn. 473 n.10.

It should be noted that the trial of the defendant's case was concluded prior to the issuance of our opinion in *Schiappa*.

of Cabral violated his constitutional right to a fair trial. We disagree with both of these contentions.

The following additional facts are relevant to our resolution of this claim. At trial, Cabral testified on direct examination that she had been with the defendant, to whom she was engaged at the time, on the night of the crime. Specifically, she testified that she picked up the defendant at his parents' home in Bridgeport just after 9 p.m. According to Cabral, the defendant was wearing a navy sports coat, black dress pants, a white shirt and a tie, did not have any bandages or patches on any part of his body that evening, and did not speak with an accent.

Cabral also testified that she and the defendant went to a party at the Odd Fellows club in Stratford, arriving there at approximately 10:15 p.m. According to Cabral, she and the defendant were late to the party and had missed dinner, but the hostess, Sonia Williams,[10] provided them with some food. Cabral further testified that she and the defendant remained at the party for approximately two hours. Cabral indicated that after she and the defendant left the party, she drove the defendant straight to his parents' home, then drove herself home.[11]

On cross-examination, Cabral testified that she had learned, sometime in February, 1995, that the defendant had been arrested for the sandwich shop robbery. The prosecutor asked Cabral if she knew which police department had arrested the defendant for the robbery. Defense counsel objected to the question, claiming that it was irrelevant and outside the scope of direct examination. The trial court overruled the objection. Cabral

[10] Williams testified that she had seen Cabral and the defendant at the party that night, and that she had reheated some food for them a little after 10 p.m.

[11] Cabral also resided in Bridgeport.

then stated that she believed that the defendant had been arrested by officers of the Bridgeport police department. The prosecutor then asked Cabral when she had reported her alibi story to the police and, without objection, Cabral responded that she never had done so. Cabral also testified, again without objection, that she never had told the police about any other potential alibi witnesses. The prosecutor then inquired of Cabral whether she ever had informed the office of the state's attorney that the defendant could not have committed the robbery because he was with her at a party when the robbery was committed. Defense counsel objected on the ground that the "assumption of this question [is] that there was some obligation [for her] to [have done] something." The trial court overruled the objection, and Cabral stated that she also had not informed the office of the state's attorney about her alibi story.

The prosecutor then asked Cabral whether she previously had come to court in connection with the defendant's case. Defense counsel again objected, stating as follows: "If the [prosecutor] is going to continue this line of questioning, I think an offer of proof would be called for. It's totally irrelevant and outside the scope of direct [examination]." The court then directed counsel to sidebar, where a brief, off-the-record discussion ensued.

At the conclusion of the sidebar conference, the prosecutor once again asked Cabral if she previously had come to court in connection with the defendant's case. The trial court overruled defense counsel's relevancy objection. Cabral then responded that the only other time she had appeared in court for the defendant's case was during jury selection. The prosecutor, noting that Cabral already had testified that she had not told the police or the prosecuting authorities of her alibi story, asked Cabral, without objection, whether she ever had

told anyone in "law enforcement" about the alibi. Cabral indicated that she had not. Finally, the prosecutor asked Cabral whether she was aware that the defendant "went to jail" when he was arrested. The trial court sustained an objection to that question by defense counsel, who then requested to be heard outside the presence of the jury. The trial court, noting that the end of the day was drawing near, excused the jury.

After the jury had been excused, defense counsel moved for a mistrial on the ground that the prosecutor had violated the trial court's prior order precluding the state from adducing testimony regarding the fact that the defendant was incarcerated at the time of trial.[12] The prosecutor responded that the question was proper because the state intended to demonstrate that, if Cabral's alibi story were true, she would have notified the police or the prosecuting authorities about the alibi in an effort to obtain the defendant's release from jail on the robbery charges at issue in this case.[13] The trial court denied the defendant's motion for a mistrial, explaining that the prosecutor had not sought to elicit information regarding the fact that the defendant was incarcerated at the time of trial but, rather, that he had been taken into custody at the time of his arrest.[14] The trial court then adjourned court for the day.

On the next day of trial, the prosecutor requested permission to voir dire Cabral in order to make an offer

---

[12] At the time of his arrest in this case, and during the pendency of the trial, the defendant was incarcerated on unrelated charges.

[13] The prosecutor explained the reason for his question as follows: "If it's relevant that an individual knows that someone is innocent and has been arrested wrongfully, if it's relevant they never went to the police department and informed the police of that, how much more relevant is it when they know it's your husband you cared enough to marry locked up in jail and you make no effort to inform anyone this is a wrongful arrest. It is a totally relevant and appropriate question to be asked at this point."

[14] The trial court's denial of the defendant's motion for a mistrial is not a subject of this appeal.

of proof for further cross-examination. The trial court granted the prosecutor's request. The prosecutor then elicited testimony from Cabral, outside the presence of the jury, that even though Cabral knew that the defendant had been in custody, in lieu of bond, since February, 1995, she nevertheless had failed to tell the police or the prosecuting authorities that the defendant could not have committed the robbery because he was at a party with Cabral and approximately 140 other people when the robbery occurred.

Defense counsel then briefly voir dired Cabral, raising, for the first time, the issue of whether Cabral had spoken to anyone else regarding her alibi story. In response to questioning from defense counsel, Cabral testified that, following the defendant's arrest in connection with the robbery at issue in this case, the defendant had told Cabral that he was represented by Attorney William Schipul.[15] Cabral also acknowledged that: (1) she had told Schipul's office about her alibi story; (2) she had understood that Schipul was "in control of the case" and that he would decide what to do with the evidence in the case; and (3) she did not think that it was appropriate for her to go to the police or the office of the state's attorney after telling Schipul about the alibi. At the conclusion of Cabral's voir dire examination, defense counsel claimed that the prosecutor should not be permitted to elicit testimony from Cabral concerning her failure to notify the authorities of the alibi, even though she knew that the defendant remained incarcerated on the robbery charges, because she had taken appropriate steps to inform defense counsel of the alibi.

The trial court took a brief recess to review certain case law[16] that the prosecutor had brought to the attention of the court and defense counsel prior to the voir

---

[15] Schipul represented the defendant throughout the trial in this case.

[16] This case law, which is pertinent to the issue raised by the defendant, and which is discussed more fully hereinafter, includes *State* v. *Jones*, 205

dire examination of Cabral. After the recess, and following argument of counsel, the trial court precluded the prosecutor from further questioning Cabral about her knowledge of the defendant's incarceration on the ground that the prejudicial effect of such testimony outweighed its probative value.[17]

The jury then returned to the courtroom, and the prosecutor proceeded with some brief, additional cross-examination of Cabral unrelated to her failure to report the alibi to law enforcement officials. On redirect examination, however, defense counsel revisited the issue, eliciting testimony from Cabral that: (1) she had told Schipul about her alibi story; (2) she had understood that Schipul was in charge of handling the defendant's case; and (3) she expected Schipul to use her information concerning the alibi in whatever way he deemed appropriate.[18]

Conn. 723, 535 A.2d 808 (1988), *State* v. *Bryant*, 202 Conn. 676, 523 A.2d 451 (1987), *State* v. *Mullings*, 202 Conn. 1, 519 A.2d 58 (1987), and *State* v. *Ghere*, 201 Conn. 289, 513 A.2d 1226 (1986).

[17] The trial court gave several reasons for its ruling, including the fact that testimony regarding the defendant's incarceration after his arrest on the robbery charges might open the door to testimony about certain "other matters" for which the defendant also had been incarcerated. In addition, the court noted that the state's proffered cross-examination of Cabral could lead to testimony regarding the advice that Schipul had given to her when she told him of the alibi, an issue that the trial court characterized as "extraneous."

[18] Cabral testified in relevant part as follows:

"[William Schipul, Defense Counsel]: You heard [the prosecutor] ask you whether you had gone to the police with information that [the defendant] had been at a party on the evening of [December 17, 1994], is that correct?

"[Cabral]: Yes.

"[Schipul]: Did you tell anybody about him being at a party on the evening of [December 17]?

"[Cabral]: Yes.

"[Schipul]: And who did you tell about being at the party on the evening of [December 17]?

"[Cabral]: His legal representative, you, Attorney Schipul.

"[Schipul]: Who was in charge of [the defendant's] case, in the way that case would be presented, in the way that case would be investigated [and] in the way that case would be handled, to the best of your knowledge?

In closing argument, defense counsel defended Cabral for bringing her alibi story to him because he alone was charged with safeguarding the defendant's rights. Defense counsel explained to the jury that it would have been futile for Cabral to have informed the authorities of her story because the state likely would not have dismissed the defendant's case on the basis of an alibi provided by the defendant's fiancee.[19]

On appeal to this court, the defendant claims that the Appellate Court improperly concluded that the trial court properly permitted the state to cross-examine Cabral regarding her failure to tell the police or prosecuting authorities about her exculpatory information.

"[Cabral]: To the best of my knowledge, you, Attorney Schipul.

"[Schipul]: And who was the only representative that [the defendant] had, the representative who was charged to represent his rights, to the best of his ability?

"[Cabral]: You.

"[Schipul]: [And] why didn't you go to the prosecutor and police with that information?

"[Cabral]: Because I trusted you to discern the information and use it as it was, as representing my husband."

[19] Defense counsel argued in relevant part: "Now, [Cabral] did not go to the police department and [she] did not go to the prosecutor's office. [Cabral] did the reasonable thing. [She] went to the . . . attorney's office. [Cabral] knows the only person who has the best interest of his client in mind is the defense attorney and he would make the best choice of what to do with the information because common sense tells you, once an arrest takes place, it's much more difficult to undo an arrest after it's taken place and this arrest had taken place. Do you think [that] if somebody marched in and said, 'I'm the wife of the defendant in this case and he wasn't there,' . . . they would just have said . . . we'll dismiss this case? They would say that is up to the jury to decide: by the way, what is your name and sit down. We'll have a chat, but we're not going to dismiss that case. We're not going to dismiss that case. That goes against reason because if that were the case I guess there is probably a bridge in Brooklyn that might be for sale. In order to prove what actually happened, [the defendant] is relying on you, the jury. He's not relying on the police. He knows the police made a mistake. Once you commit yourself to something, you tend to go down that road. You tend to stick with that perception. You tend to dig in and say I'm not wrong. You got it wrong. I'm not wrong."

Specifically, the defendant claims that such cross-examination was improper because Cabral had reported her version of the facts to defense counsel, who she reasonably believed would use that information appropriately and in the defendant's best interests. Because the defendant failed to alert properly the trial court that Cabral had spoken to defense counsel, we reject the defendant's claim of evidentiary impropriety.

"Our role in reviewing evidentiary rulings of the trial court is settled. This court has consistently held that trial courts are vested with broad discretion in rulings on relevancy and every reasonable presumption must be given in favor of the court's ruling. . . . Evidence is relevant if it tends to establish a fact in issue or corroborates other direct evidence. . . . Rulings on such matters will be disturbed on appeal only upon a showing of a clear abuse of discretion." (Internal quotation marks omitted.) *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 184–85, 646 A.2d 195 (1994).

In *State* v. *Ghere*, 201 Conn. 289, 513 A.2d 1226 (1986), we stated that, "[a]lthough we do not believe that an alibi witness has a duty to report an alibi story to the police or, for that matter, to any other person, a witness in many instances naturally may be expected to convey such information, especially when the witness is friendly with the accused." Id., 304. We concluded that the "[f]ailure of the witness to do so would, under [those] circumstances, constitute grounds for impeachment"; id.; because the failure to report an alibi under such circumstances is "relevant on the issue of credibility or, more specifically, the issue of fabrication." Id.; see also *State* v. *Jones*, 205 Conn. 723, 737–38, 535 A.2d 808 (1988); *State* v. *Mullings*, 202 Conn. 1, 14–15, 519 A.2d 58 (1987).

Thereafter, in *State* v. *Bryant*, 202 Conn. 676, 705, 523 A.2d 451 (1987), we recognized that an alibi witness'

failure to report an alibi to law enforcement officials may not always be appropriate grist for the cross-examination mill. As we stated in *Bryant*, "some persons may routinely avoid contact with law enforcement authorities out of an ingrained sense of fear or mistrust of officialdom. . . . Others may refrain from volunteering information to the police or [prosecuting attorney] because they believe that their efforts to exonerate the suspect would be futile . . . [and] some may remain silent because they were explicitly instructed to do so by the defendant's attorney. . . . These examples are, however, hardly exhaustive." (Citation omitted; internal quotation marks omitted.) Id. Thus, in *Bryant*, we noted that "[i]t may be prudential for the trial court to have a bench conference to ascertain whether [a] witness refrained from speaking under the advice of defense counsel, for in such a case examination on the issue of the witness' postconsultation silence would be improper and could well result in a mistrial." (Internal quotation marks omitted.) Id., 705–706.

In this case, the defendant failed to object to the prosecutor's cross-examination of Cabral on the ground that she had provided her alibi story to defense counsel; indeed, there is nothing in the record to indicate that, prior to the prosecutor's voir dire examination of Cabral, either the state or the trial court was aware of the fact that Cabral had approached defense counsel and informed him of the alibi.[20] Instead, defense counsel merely claimed that the prosecutor's line of questioning was improper on the grounds that it was irrelevant and beyond the scope of direct examination. In light of our holding in *Ghere*, however, and in the absence of any notice to the trial court that Cabral had informed

[20] As the defendant conceded in his brief to this court: "The state was apparently surprised by the [testimony of Cabral] because [the state had] not filed a demand for notice of alibi pursuant to [Practice Book] § 40-21."

defense counsel about her alibi story, the court reasonably concluded that the prosecutor's line of questioning was proper because, in light of Cabral's close, personal relationship with the defendant,[21] "it would only have been natural for [Cabral] to exculpate the defendant of any wrongdoing by approaching [law enforcement officials]." *State* v. *Ghere*, supra, 201 Conn. 305. To reach a different conclusion "would result in a trial by ambuscade of the trial judge."[22] (Internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 311, 664 A.2d 743 (1995); accord *State* v. *Newsome*, 238 Conn. 588, 597, 682 A.2d 972 (1996).

The defendant also contends, however, that even if his claim of evidentiary impropriety was not preserved properly, the prosecutor's cross-examination of Cabral violated his due process right to a fair trial. The defendant seeks to prevail on his constitutional claim under *State* v. *Golding*, supra, 213 Conn. 239–40. While the record is adequate for our review of the defendant's unpreserved constitutional claim, we reject his contention that the testimony the prosecutor elicited from Cabral on cross-examination violated the defendant's due process rights.

"Due process seeks to assure a defendant a fair trial, not a perfect one." *State* v. *Kurvin*, 186 Conn. 555, 565, 442 A.2d 1327 (1982); accord *State* v. *Rhodes*, 248 Conn. 39, 47, 726 A.2d 513 (1999); *State* v. *Daugaard*, 231 Conn. 195, 218, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995). Thus, principles of due process are violated only if the alleged impropriety so compromised the integrity of the trial as to call into question the reliability of the verdict.

---

[21] The evidence also established that Cabral, a Bridgeport resident, had numerous opportunities to notify the police or the prosecuting authorities of her alibi story.

[22] We note, moreover, that the defendant never sought a curative or cautionary instruction regarding Cabral's testimony on cross-examination.

Although the jurors learned of Cabral's failure to contact the police or prosecuting authorities regarding her alibi story, they also learned that Cabral had informed defense counsel of her version of the events and, furthermore, that she believed that defense counsel would use her information as he deemed appropriate, in the defendant's best interests. Cabral's entirely plausible explanation was buttressed by defense counsel who, in closing argument, stated that Cabral, by informing *him* that she was with the defendant when the robbery occurred, had done "the reasonable thing." Defense counsel further explained to the jury that it would be naive for the jury to think that the state would have dropped the charges against the defendant if Cabral, his fiancee at the time, had informed the police or the prosecuting authorities that the defendant was with her on the night of the robbery.[23] Furthermore, the prosecutor, in closing argument, did not mention the fact that Cabral had failed to notify law enforcement officials of her alibi story. Finally, the prosecutor did not attempt to adduce testimony indicating that Cabral had refrained from speaking to the police or prosecuting authorities on the advice of defense counsel, nor did the defendant ever claim that Cabral had received such advice from defense counsel. See *State* v. *Bryant*, supra, 202 Conn. 705–706 (noting impropriety of cross-examining alibi witness' postconsultation silence if that "witness refrained from speaking [to law enforcement officials] under the advice of defense counsel" [internal quotation marks omitted]). Thus, as the Appellate Court stated, "Cabral was given an opportunity to explain her silence without having to divulge the substance of any conversation with defense counsel." *State* v. *Watson*, supra, 47

---

[23] Thus, defense counsel, instead of seeking a curative or cautionary instruction regarding Cabral's testimony on cross-examination; see footnote 22 of the opinion; chose to address the issue of her failure to alert the police or prosecuting authorities about her alibi story by highlighting the fact that Cabral had informed defense counsel.

Conn. App. 802. Under such circumstances, we cannot conclude that Cabral's testimony regarding her failure to notify law enforcement officials of her alibi story so tainted the trial as to cast doubt on its fundamental fairness. Consequently, the defendant's constitutional claim must fail.[24]

The judgment of the Appellate Court is affirmed.

In this opinion BORDEN, MCDONALD and PETERS, Js., concurred.

BERDON, J., dissenting. I would reverse the conviction of the defendant, Michael Watson, on the ground that his due process rights were violated when the trial court instructed the jury that the reasonable doubt standard and the presumption of innocence are "designed to protect the innocent and not the guilty"[1] (protect-the-innocent instruction). Although the majority has finally agreed with me that the protect-the-innocent instruction should not have been given, they refuse to reverse the defendant's conviction because, in the context in which the jury was instructed, it did not reach constitutional proportions. The majority reaches this amazing conclusion based upon two recent cases—*State* v. *Delvalle*, 250 Conn. 466, 736 A.2d 125 (1999), and *State* v. *Schiappa*, 248 Conn. 132, 728 A.2d 466 (1999).[2] The

---

[24] For purposes of future cases, we note that both the state and the accused can assist the trial court in avoiding the problems that gave rise to the defendant's claim in this case. For example, the state has the right to obtain the names and addresses of alibi witnesses pursuant to Practice Book § 40-21 and, consequently, can determine whom the defendant intends to call in support of his or her alibi defense. Furthermore, the accused may file a motion in limine detailing the reasons why cross-examination of an alibi witness concerning that witness' failure to report the alibi to law enforcement officials would be inappropriate.

[1] A more extensive portion of the trial court's instructions in this case appears later in this opinion.

[2] I was not assigned to sit on the panel for *Schiappa*, which was decided by a full court of seven justices (a senior justice was selected to complete the panel of seven). Nor was I assigned to the panel of five justices that decided *Delvalle*.

I have long been of the view that every case heard in this court should

constitutional aspects of the protect-the-innocent instruction were wrongly decided in *Schiappa* and *Delvalle*, standing the holding of *United States* v. *Doyle*, 130 F.3d 523 (2d Cir. 1997), on its head.

As early as 1992, I urged this court to disapprove of this problematic protect-the-innocent instruction because it unconstitutionally dilutes the presumption of innocence and the reasonable doubt standard. See *State* v. *Stanley*, 223 Conn. 674, 702–703, 613 A.2d 788 (1992) (*Berdon, J.*, dissenting);[3] see also *State* v. *Hines*, 243 Conn. 796, 824, 709 A.2d 522 (1998) (*Berdon, J.*, dissenting). Justice Borden, writing for the majority in *Stanley*, sharply rejected the defendant's argument that the court should "change its mind" about allowing the protect-the-innocent instruction by tersely stating, "[w]e do not change our mind." *State* v. *Stanley*, supra, 695. Seven years later, in *State* v. *Schiappa*, supra, 248 Conn. 168, this court finally started to change its mind by holding that "[a]lthough we disapprove of the challenged language and, pursuant to our supervisory authority over the administration of justice, direct our trial courts to refrain from using the challenged language in future cases, we nevertheless reject the defendant's constitutional claim." See also *State* v. *Delvalle*, supra, 250 Conn. 475. As I will discuss later in this dissent, I do not think *Schiappa* was decided correctly. I agree with the majority in *Schiappa* that the protect-the-innocent instruction should not be given under any

be by an en banc panel consisting of the chief justice and six associate justices. Senior justices should participate on an en banc panel only if there is a disqualification of the chief justice or an associate justice. This will assure that all the justices of this court would have an opportunity to participate and express their views on all the issues that come before the court so that justice is not dispensed by the luck of the draw. Furthermore, if an issue is important enough to come to this court, an en banc panel should review it.

[3] The protect-the-innocent instruction could well have influenced the jury's determination that the defendant in *Stanley* was guilty of murder because the evidence to support an intent to kill was paper-thin.

circumstance but I disagree that the instruction did not reach constitutional proportions.

Unfortunately, over the course of the years, this jury instruction, which the majority has finally recognized as being improper, probably misled many jurors. Of course, we will never know the true extent of the injustice caused by the protect-the-innocent instruction. Indeed, in addition to the present case, this court certified for appeal a review of a similar jury instruction that " 'the law is made to protect society and innocent persons, and not to protect guilty ones.' " *State* v. *Coleman*, 245 Conn. 907, 718 A.2d 15 (1998). So long as the trial courts continue to use it and this court continues to find no reversible error, we will convict criminal defendants without regard to their constitutional rights.

Any doubt as to the unconstitutionality of the protect-the-innocent instruction was put to rest by the Second Circuit Court of Appeals in *United States* v. *Doyle,* supra, 130 F.3d 523. In *Doyle*, the court held that an instruction violated the defendant's federal constitutional right to due process and, consequently, reversed the defendant's conviction. Id., 539. Several other federal circuit courts have reversed convictions based on similar jury instructions that imply that the reasonable doubt standard does not apply to guilty individuals. See, e.g., *United States* v. *Bridges*, 499 F.2d 179 (7th Cir. 1974); *Reynolds* v. *United States*, 238 F.2d 460 (9th Cir. 1956); *Gomila* v. *United States*, 146 F.2d 372 (5th Cir. 1944). We should join the Second Circuit and "reaffirm the proposition that the presumption of innocence and the beyond-a-reasonable doubt standard apply to all criminal defendants without regard to their actual guilt or innocence." *United States* v. *Doyle,* supra, 538.

As I have advocated since my dissent in *State* v. *Stanley*, supra, 223 Conn. 702–703, this jury instruction

violates a defendant's due process rights by impermissibly diluting the presumption of innocence and the state's burden to prove the defendant guilty beyond a reasonable doubt. See also *United States* v. *Doyle*, supra, 130 F.3d 533. The due process clause protects the criminal defendant's right to a presumption of innocence until proven guilty. It also requires that this presumption continues until the prosecution satisfies its evidentiary burden of proof. See *In re Winship*, 397 U.S. 358, 361–64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *United States* v. *Doyle*, supra, 538–39. Thus, when a jury is instructed improperly on the presumption of innocence, it dilutes the state's burden of proving guilt beyond a reasonable doubt.

Jury instructions are the primary mechanism through which the trial court guides jurors in their deliberations. "To be a meaningful safeguard, the reasonable doubt standard must have a tangible meaning that is capable of being understood by those who are required to apply it. It must be stated accurately and with the precision owed to those whose liberty or life is at risk. Because of the extraordinarily high stakes in criminal trials, '[i]t is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned.' " *Victor* v. *Nebraska*, 511 U.S. 1, 29, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994) (Blackmun, J., concurring and dissenting). Similarly, the Second Circuit in *Doyle* recognized the potential for this challenged language to interfere with jurors' reasoning process. *United States* v. *Doyle*, supra, 130 F.3d 538–39. Ideally, jurors presume that the defendant is innocent until the prosecution satisfies its burden of proof. By instructing jurors that the presumption of innocence protects only the innocent and not the guilty, the trial court suggests to jurors that their assessment of the defendant's guilt is separate and distinct from the prosecution's burden of proving

guilt beyond a reasonable doubt. "[I]t implies that a person who is actually guilty, in the sense of 'what really happened,' as opposed to the sense of having been legally determined to be guilty, is not entitled to the presumption of innocence through trial and deliberations." Id., 538. The consequence of asking jurors to assess guilt too early is that "[t]he presumption of innocence and the reasonable doubt standard are eviscerated if the jury believes that it must, or even may, make a determination of the defendant's guilt or innocence before evaluating the strength of the Government's case." Id.

The instruction may also undermine the allocation of decision-making authority by permitting the jury to infer that the judge herself believes that the defendant is guilty. "A natural inclination of some jurors may be to assume that, because the defendant has been selected for prosecution, he must be guilty. One of the greatest responsibilities of the trial judge is her duty to overcome that inclination by impressing upon the jury the importance of the presumption of innocence and of the Government's burden to prove guilt beyond a reasonable doubt. . . . As the Supreme Court noted in [*In re Winship*, supra, 397 U.S. 363–64], the reasonable doubt standard is vital in part because it ensures against unjust convictions and reduces the risk of factual error. . . . In order to reduce those risks, then, the jurors must be made to see that the case against the defendant begins as a tabula rasa, a slate upon which may be written only such marks as derive from the evidence admitted at trial. Unless and until the Government meets its burden of proof beyond a reasonable doubt, the presumption of innocence remains with the accused regardless of the fact that he has been charged with the crime, regardless of what is said about him at trial, regardless of whether the jurors believe that he is likely guilty, regardless of whether he is actually guilty. The

presumption attaches to those who are actually inno-
cent and to those who are actually guilty alike through-
out all stages of the trial and deliberations unless and
until that burden is met. A jury charge which implies
otherwise creates a serious risk of undermining that
vital protection." (Citations omitted.) *United States* v.
*Doyle,* supra, 130 F.3d 538–39.

In the present case, the majority summarily con-
cludes, as it did in *Schiappa* and *Delvalle,* that the
trial court repeatedly and accurately explained those
required principles in its preliminary and final instruc-
tions to the jury. Therefore, according to the majority,
the protect-the-innocent instruction was harmless.
While the majority finds the present case is indistin-
guishable from *Schiappa* and *Delvalle,* from my per-
spective both those cases were wrongly decided.

In *Schiappa,* the court relied on the language in *Doyle*
that if the jury instruction correctly and *repeatedly*
explained the presumption of innocence and the state's
burden of proving guilt beyond a reasonable doubt it
would pass constitutional muster. *State* v. *Schiappa,*
supra, 248 Conn. 172–74; see *United States* v. *Doyle,*
supra, 130 F.3d 539. The *Schiappa* court pointed out
the numerous references that were made in the instruc-
tions to the burden of proof and the presumption of
innocence. *State* v. *Schiappa,* supra, 172–73. But in the
present case, as well as in *Schiappa,* those references
cannot overcome the likelihood that the jury misinter-
preted its instructions for several reasons.

First, although *Doyle* referred to the repeatedly cor-
rect instructions, in my view the Second Circuit did not
merely have references to the constitutional guarantees
but, rather it referred to complete statements of the
presumption of innocence and the state's burden of

proof.[4] *United States* v. *Doyle*, supra, 130 F.3d 539. By contrast, the so-called repeated instructions upon which the court in *Schiappa*, and the majority in this case, rely were mere fragmented references to those constitutional principles.[5] *State* v. *Schiappa*, supra, 248 Conn. 168–69.

Second, this case is even more compelling than *Doyle*, wherein a correct instruction was given at the end of the trial court's substantive instructions to the jury. *United States* v. *Doyle*, supra, 130 F.3d 539 ("[w]hile [the] final section of the court's instructions was undoubtedly more appropriately worded than was its

[4] Although the entire text of the instructions given to the jury in *Doyle* is not available to me, I suspect that there also were numerous fragmented references to the government's burden of proof and the presumption of innocence.

[5] In *Schiappa*, this court interpreted the challenged language in the context of the jury instruction as a whole. The court rationalized that "in light of the totality of the trial court's instructions in this case, we see no compelling reason to deviate from our prior constitutional precedent. The court, in clear and legally correct terms, repeatedly apprised the jury regarding the presumption of innocence and the state's burden of establishing guilt beyond a reasonable doubt." *State* v. *Schiappa*, supra, 248 Conn. 172. It is important, however, to consider not just that references were made but the sufficiency of these repeated references.

The court in *Schiappa* summarized the applicable instructions noting that the jury received reminders that the state had a burden to prove guilt beyond a reasonable doubt and the defendant did not have a corresponding burden. See id., 168. Subsequently, the trial court gave explicit instructions as follows: (1) " 'every defendant in a criminal case is presumed to be innocent and this presumption of innocence remains with the defendant throughout the trial unless and until she is proven guilty beyond a reasonable doubt' "; (2) " 'the state has the burden of proof as to all the necessary elements of the crimes charged beyond a reasonable doubt and the defendant has [no] burden to prove or disprove anything' "; and (3) "[t]he jury must acquit the defendant if the state failed to establish 'each and every element of the particular crime charged beyond a reasonable doubt . . . .' " Id., 168–69.

What the majority considers as repeated references to the defendant's constitutional rights can be seen only as fragmented references to abstract legal concepts. In the spirit of more is better, the majority ignores the likelihood that abstract legal concepts may be meaningless to the lay juror no matter how many times they are repeated.

reference to guilty defendants, we nevertheless agree . . . [that] '[w]hat influences juries, courts seldom know' "). In *Schiappa* and in this case, the improper instruction was given at the end of the substantive[6] part of the jury instructions and after any further references were made to the burden of proof and presumption of innocence instructions.[7] *State* v. *Schiappa*, supra, 248 Conn. 169–71.

The final instruction on the substantive law given by the trial court in this case was: "It is the sworn duty of the court and the jurors to safeguard the rights of persons charged with crimes by respecting the presumption of innocence which the law imputes to every person so charged by making the state meet its burden of proof beyond a reasonable doubt. *But, you must keep in mind that this rule of law is made to protect the innocent and not the guilty.* If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that the accused is guilty of the crime or crimes charged, then it is the sworn duty of the jury to enforce the law and to render a verdict of guilty." (Emphasis added.) This court has

---

[6] The remaining instructions by the trial court after the protect-the-innocent instruction referred to the requirement of a unanimous verdict and to procedural matters such as the selection of a foreperson.

[7] I suspect that this was also the case in *Schiappa* because the protect-the-innocent instruction was part of the informal pattern jury instructions utilized by the trial judges. Indeed, in Justice Borden's treatise on criminal jury instructions, which he authored with Professor Orland, the instructions recommended to be given at the conclusion of the charge were as follows: "It is the sworn duty of the courts and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence, which the law gives to every person so charged. *But the law is made to protect society and innocent persons, and not to protect guilty ones.* If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that an accused person is guilty of the crime charged, then it is the sworn duty of the jury to enforce the law and to render a verdict of guilty." (Emphasis added.) D. Borden & L. Orland, 5 Connecticut Practice Series: Criminal Jury Instructions (2d Ed. 1997) § 4.3, pp. 222–23.

long noted the magnitude of the effect of the last words heard by a jury. See *State* v. *Gallivan*, 75 Conn. 326, 333–34, 53 A. 731 (1902) ("[w]here the court . . . returns to a subject considered [earlier] and gives additional instructions in regard to it, the jury may naturally regard them, so far as they may state a new and different rule, to be intended to qualify, as a last word, that which had been previously said"). In effect, the incorrect statement of the law was followed by an admonition to find the defendant guilty. In this context, the jurors reasonably could have believed that if the defendant was guilty, then it was not necessary to apply the presumption of innocence until the state satisfied its burden of proving guilt beyond a reasonable doubt.

Third, notwithstanding the repeatedly correct instruction language in *Doyle*, the Second Circuit recognized that its prior opinion in *United States* v. *Bifield*, 702 F.2d 342 (2d Cir. 1983), on the protect-the-innocent instructions "addressed only the aspect of the presumption of innocence, and not the effect of the charge upon the reasonable doubt standard. For our purposes, [the Second Circuit recognized that] this is a critical distinction: the Supreme Court has provided new and definitive guidance reinforcing the importance of the reasonable doubt standard in the years since *Bifield*. For these reasons, we take a fresh look at whether this instruction violates a criminal defendant's rights to the presumption of innocence and to have his guilt established by the Government beyond a reasonable doubt, while keeping in mind our repeated disapproval of the instruction in question in the past.

" 'The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of our criminal law.' *Coffin* v. *United States*, 156 U.S. 432, 453, 15 S. Ct. 394, 403, 39 L. Ed. 481 (1895). This presumption 'is a basic component of

a fair trial,' *Estelle* v. *Williams*, 425 U.S, 501, 503, 95 S. Ct. 1691, 1692, 48 L. Ed. 2d 126 (1976), and derives from the Due Process Clauses under the Fifth and Fourteenth Amendments of the Constitution, *Taylor* v. *Kentucky*, 436 U.S. 478, 485–86 n.13, 98 S. Ct. 1930, 1935 n.13, 56 L. Ed. 2d 468 (1978). Likewise, requiring the Government to carry the heavy burden of proving a defendant guilty beyond a reasonable doubt is sacrosanct law and derives from the Due Process Clause. *In re Winship*, [supra, 397 U.S. 361–64] (conviction requires proof beyond a reasonable doubt of every fact necessary to constitute the crime charged). See also *Jackson* v. *Virginia*, 443 U.S. 307, 313–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979) (habeas petition following state conviction) (proof beyond a reasonable doubt must be established for every element of the crime charged). [*In re Winship*] made clear that the reasonable doubt standard is the means by which the presumption of innocence is implemented. [*In re Winship*, supra, 363]. Because our system entrusts the jury with the primary responsibility of implementing the substantive protections promised by the reasonable doubt standard, reasonable doubt jury instructions which appropriately convey [*In re Winship*] concepts are critical to the constitutionality of a conviction. See, e.g., *Cage* v. *Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990). Similarly, the Court has recognized that 'an instruction on the presumption [of innocence] is [the] one way of impressing upon the jury the importance of that right.' *Taylor* [v. *Kentucky*, supra, 485] (collecting cases). The case at bar thus squarely implicates both principles of law." *United States* v. *Doyle*, supra, 130 F.3d 534–35.

As pointed out in *Doyle*, "[w]e cannot be sure whether [the] jury actually misunderstood its obligations under the presumption of innocence and the reasonable doubt standard. But . . . we need not be sure. We need only

determine whether there is a reasonable likelihood, even if less than a probability, that the jury misunderstood these principles of law." Id., 539. In sum, I conclude in this case that it was reasonably likely that the jury unconstitutionally applied the protect-the-innocent instruction. Therefore, I would hold that the defendant's federal constitutional right to due process was violated, reverse the judgment of conviction and remand the case for a new trial.

Accordingly, I dissent.