******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JASON LAMAR LUTHER
(AC 34596)

Beach, Keller and Pellegrino, Js.

*Argued March 12—officially released September 9, 2014*

(Appeal from Superior Court, judicial district of New Haven, B. Fischer, J.)

*Alice Osedach*, assistant public defender, with whom was *Kristen Mostowy*, certified legal intern, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Mary Elizabeth Baran*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

PELLEGRINO, J. The defendant, Jason Lamar Luther, appeals from the judgment of conviction, rendered after a jury trial, of criminal possession of a firearm in violation of General Statutes § 53a-217, carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a), and interfering with an officer in violation of General Statutes § 53a-167a. On appeal, the defendant claims that the trial court violated his right to due process, as guaranteed by the fourteenth amendment to the United States constitution, when it improperly (1) allowed the state to elicit testimony regarding his post-*Miranda*[1] silence in violation of his fifth amendment right to remain silent, and (2) allowed his accomplice to invoke his fifth amendment privilege against self-incrimination and not testify. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 6 p.m. on April 18, 2010, the victim left his house in New Haven to get something to eat and drink at a nearby convenience store. From there, the victim walked to a friend's house that was located close to the store. The victim knocked on the door, but when no one answered he decided to return home.

While walking home, the victim noticed that he was being followed by two men, the defendant and his accomplice, Raymond Lee Smokes. When the victim turned his head and made eye contact with one of the two men, the man asked what he was looking at. Subsequently, Smokes physically confronted the victim. He attempted to take the victim's cell phone, and a struggle ensued. The pair began wrestling on the ground. During the struggle, Smokes cut the victim on his face with a razor blade. The defendant stood several feet away holding a firearm while the altercation was taking place. The defendant and Smokes eventually fled with the victim's cell phone and keys.

The victim returned home and his mother called the police to report the incident. Officers Craig C. Miller and Ann M. Mays of the New Haven Police Department responded to the victim's house. The victim told the officers what had happened and described the individuals who attacked him. He described the two men as wearing baseball hats and red jackets. He said that Smokes had cut his face with a razor blade, and that the defendant was in possession of a firearm. Mays alerted other officers who were in the area of the robbery, and also conveyed a description of the suspects.

Officer Armando Vale of the New Haven Police Department received a report of two individuals running in the area who matched the description of Smokes and the defendant. Vale drove his marked police vehicle in front of the defendant and Smokes. When Vale stated

that he wanted to speak with them, the defendant and Smokes fled and jumped over a fence. They then encountered two more uniformed New Haven police officers, Richard Cotto and David Acosta, who identified themselves as police and directed the fleeing suspects to stop. The defendant and Smokes then split up and began running in separate directions. Cotto continued to follow the defendant. When he caught up with the defendant he again directed him to stop. Cotto attempted to apprehend the defendant, who resisted arrest by pushing the officer. As a result, Cotto deployed his Taser on the defendant, administering one five-second cycle of electricity that immobilized him. After both the defendant and Smokes were detained, the victim identified them as the individuals who had robbed him.[2]

The officers then retraced the route that the defendant and Smokes had taken to search for anything that the individuals may have dropped. The officers found a red jacket and a firearm where the defendant and Smokes had jumped over the fence. The victim stated that the red jacket the police seized was consistent with the jacket that the defendant wore during the robbery. The police found the victim's cell phone on top of the jacket. Inside of the pocket of the jacket was a second cell phone. It was later determined that the phone numbers contained in the second cell phone corresponded to the family members and friends of the defendant.[3] The victim identified the gun recovered as the one held by the defendant during the robbery. An analysis of the gun revealed that the defendant could not be excluded as a contributor to the DNA found on the handle.[4]

After a jury trial, the court rendered judgment of conviction of criminal possession of a firearm, carrying a pistol or revolver without a permit, and interfering with an officer.[5] The defendant appeals, claiming that (1) his due process right to remain silent was violated when the state was allowed to question him regarding his post-*Miranda* silence, and (2) the court improperly precluded him from calling Smokes as a witness by allowing him to invoke his fifth amendment privilege against self-incrimination. We disagree. Additional facts will be set forth as necessary.

I

The defendant claims that the state cross-examined him regarding his post-*Miranda* silence[6] in violation of the fifth and fourteenth amendments to the United States constitution. We disagree. The following facts are necessary for the resolution of this claim. While the defendant was incarcerated and awaiting trial, he filed a complaint with the New Haven Police Department alleging that he was falsely arrested, the officers used excessive force, the arrest was motivated by hate or bias, and he was verbally abused. The defendant claimed, in part, that Cotto had deployed his Taser on him unjustifiably because he had not been resisting

arrest at the time. Two sergeants from the police department's internal affairs unit (sergeants) investigated the complaint.

The sergeants met with the defendant and John Bowdren, the defendant's attorney, at the New Haven Correctional Center.[7] Bowdren told the sergeants that he was concerned that something the defendant might say during the interview potentially could be used against him in his criminal trial. The sergeants assured him that they were only there to investigate the defendant's civil complaint and not the underlying crime. They cautioned, however, that either of them could be forced to testify in court on the basis of the information provided during the interview. Bowdren said that he understood and would interrupt the defendant if he began giving an incriminating response.

The defendant then proceeded to give four different explanations as to why he was running away from the police, prior to being arrested, in support of his claim that there was no justification for Cotto using his Taser.[8] First, the defendant told the sergeants that he and Smokes were behind an establishment called "Spunky's." He stated that they went there to smoke marijuana and that when he came "trotting" out from behind the building an officer deployed his Taser for no reason. Second, the defendant stated that he was behind "Spunky's" with Smokes getting ready to smoke marijuana when he saw an officer in plain clothes carrying a gun and running toward them. When the officer said, "[D]on't move," Smokes grabbed the defendant and said, "[L]et's go." Although the defendant initially did not move, he later " 'trotted' " off until he ultimately stopped after seeing more officers. The defendant claimed that even though he put his hands up after seeing the officers, an officer deployed his Taser anyway. Third, the defendant said that while he was behind "Spunky's" with Smokes, an unidentified white male began running toward him. Thinking he was about to be robbed, the defendant initially froze, but eventually ran off. Finally, the defendant stated that he ran from the police because he was on parole and was in possession of marijuana. In sum, the letter documenting the investigation stated: "[The defendant] was inconsistent in describing the events leading up to the point when he is [T]asered. [The defendant] provided several variations as to when he identified the white male running towards him to be a police officer." There is no record that Bowdren stopped the interview at any time, or that the defendant expressly invoked his right to remain silent in response to the sergeants' questioning.

At trial, the defendant gave a different account of the events surrounding his arrest. According to the defendant's testimony at trial, he was familiar with the victim because Smokes previously had sold marijuana to the victim on several occasions. The defendant testified

that, on the date in question, he was on the corner of Fillmore Street and Pine Street in New Haven when he observed the victim and Smokes having a conversation. At some point the two started arguing. Then, Smokes lunged at the victim's waist, and a physical confrontation ensued during which a gun dropped from the victim's person. Smokes picked it up and the victim ran away, leaving his cell phone behind. The defendant testified that subsequently he and Smokes ran away because "I was upset . . . I could have got robbed or shot. . . . I basically was just trying to get out of there. I was, like, we got to go, we got to get moving here." After noticing all of the police activity, according to the defendant, they continued to run because Smokes was in possession of marijuana, the victim's gun, and the victim's cell phone. The defendant left his jacket behind "Spunky's" before he was apprehended.

During cross-examination, the state asked the defendant questions in order to highlight the inconsistencies between his direct examination testimony and the multiple stories he had told the sergeants who had investigated his civil complaint. The state asked the defendant if he gave the sergeants "three very distinct and different versions of events." The defendant denied doing so. The state asked: "[T]his story that you have told the jury today about [the victim] buying marijuana, this is actually the fifth version of what occurred that night that you [have] given. . . . [I]n the other four versions . . . you had never mentioned [that the victim was buying marijuana]." The defendant objected, and the court allowed this line of questioning as "appropriate cross-examination . . . ." The defendant responded: "I never gave other versions of anything." The state's line of questioning focused on the fact that the defendant's testimony at trial was inconsistent with the account he gave the sergeants because he never told them: (1) the victim was there to buy marijuana from Smokes, (2) the victim possessed the gun, (3) Smokes possessed the gun, and (4) he ran because he was panicked that the victim could have used the weapon to rob him. We conclude that the defendant's testimony was inconsistent with his statement to the sergeants, and therefore it was proper to cross-examine him on the basis of these inconsistencies.

The following legal principles guide our analysis. "In *Doyle* [v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)] . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that *Miranda* warnings contain no express assurance that silence will carry no penalty,

such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 764–65, 931 A.2d 198 (2007). "References to one's invocation of the right to remain silent [are] not always constitutionally impermissible, however. . . . We have allowed them in certain limited and exceptional circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 441, 862 A.2d 817 (2005).

"[T]he exception to *Doyle* articulated [by the United States Supreme Court] in *Anderson* v. *Charles*, 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980) . . . [is] that *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. . . . [T]he court in *Anderson* . . . concluded that the impeachment questions were proper because they were not intended to attach meaning to silence, but to elicit an explanation for a prior inconsistent statement. . . . Where [a] defendant elects to speak to the police and gives statements that he later contradicts at trial, a prosecutor's inquiry into the defendant's failure to give the exculpatory account before trial does not draw a negative inference from the defendant's decision to remain silent but rather from his prior inconsistent statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Alston*, supra, 272 Conn. 443–44. "It is elementary that a defendant who elects to testify in his own behalf is subject to cross-examination and impeachment just as is any witness . . . [including] by evidence of his materially inconsistent statements." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, 163 Conn. 304, 306–307, 306 A.2d 855 (1972).

In light of our Supreme Court's guidance in *Alston*, we conclude that the defendant waived his right to remain silent with respect to the subject matter included in the statements he made to the sergeants. The record reflects that the defendant was aware of his *Miranda* rights, and invoked them previously when he ended the initial interview with the sergeants. See footnote 7 of this opinion. Furthermore, the sergeants apprised the defendant that any incriminating statements he might give could be used against him in his criminal trial. Despite this warning, the defendant spoke to the sergeants voluntarily, and, therefore, he waived his right to remain silent with respect to the subject matter of those statements. *State* v. *Alston*, supra, 272

Conn. 443.[9]

The issue then becomes delineating the subject matter of the defendant's statement to the sergeants so that we may determine the extent to which the defendant had waived his right to remain silent. During the interview, the defendant supported his claim that Cotto was unjustified in deploying his Taser by explaining to the sergeants that he was not fleeing from the police. The defendant gave several reasons as to why he was running: (1) he was running for no reason at all; (2) Smokes told him to run after seeing someone with a gun running at them; (3) he saw someone running toward him and thought he was going to be robbed; and (4) he was on parole and in possession of a bag of marijuana. Generally speaking, the subject matter of his statement to the sergeants was why he had been running on the date in question.

The court did not abuse its discretion in allowing the state to impeach the defendant's testimony at trial with respect to why he was running on the date in question if his explanation at trial was inconsistent with the statement he gave to the sergeants. "Impeachment of a witness by the use of a prior inconsistent statement is proper only if the two statements are in fact inconsistent. . . . [T]he purpose of such evidence is to induce the tribunal to discard the one statement because the witness has also made another statement which cannot at the same time be true . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Richardson*, 214 Conn. 752, 763–64, 574 A.2d 182 (1990). "In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Whelan*, 200 Conn. 743, 748–49 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). "Inconsistencies may be shown not only by contradictory statements but also by omissions." Id., 748 n.4. An omission is inconsistent when, under the circumstances, it would have been natural for the witness to convey that information. See *State* v. *Watson*, 251 Conn. 220, 235–37, 740 A.2d 832 (1999);[10] see also *Falls* v. *Loew's Theaters, Inc.*, 46 Conn. App. 610, 615, 700 A.2d 76 (1997) (prior statement inconsistent if it "fails to mention a material fact presently testified to that it should have been natural to mention in the prior statement" [internal quotation marks omitted]). A trial court has broad discretion in determining whether two statements are inconsistent. *State* v. *Whelan*, supra, 749 n.4. Whether an excep-

tion to *Doyle* applies, however, is a question of law over which we exercise plenary review. See *State* v. *Lee-Rivers*, 130 Conn. App. 607, 613, 23 A.3d 1269, cert. denied, 302 Conn. 937, 28 A.3d 992 (2011).

The overall impression left by the defendant's trial testimony regarding why he was running at the time of his arrest was inconsistent with the various accounts he gave to the sergeants. His trial testimony was that he was on the corner of Fillmore Street and Pine Street when he ran because he panicked after realizing that he could have been robbed by someone he knew, specifically, the victim. He continued to run because of the police presence in the area and the fact that Smokes was carrying the victim's gun, the victim's cell phone, and marijuana. These facts are inconsistent with, or would have naturally been included in, his statement to the sergeants.

In the defendant's statement to the sergeants, he omitted the fact that he was running away from someone who almost robbed him, specifically, the victim, and not running from the police. The fact that the defendant knew the individual that he was running from was a material fact that supported his claim that he was not running from the police, and, by extension, that Cotto was not justified in deploying his Taser. It therefore would have been natural for the defendant to tell the sergeants that he was running from someone he knew and how he was familiar with that person. As a result, the defendant's testimony at trial that he knew the victim because he had bought marijuana from Smokes is inconsistent with his prior statement to the sergeants. See *State* v. *Watson*, supra, 251 Conn. 236–37.

The other aspects of the defendant's testimony that were highlighted by the state also were inconsistent with his prior statement to the sergeants because that testimony included facts that naturally would have been included in his statement to support his claim that Cotto was not justified in deploying his Taser. The defendant testified that he initially ran because the victim had a gun and the defendant realized he could have been robbed. The defendant also testified that he continued to run because Smokes was in possession of marijuana and the victim's gun. These accounts are inconsistent with the versions he told the sergeants, specifically, the version in which he stated that was running for no reason and the version in which he ran because he was on parole and in possession of marijuana. It would have been natural for the defendant to tell the sergeants the exculpatory version of events that he testified to at trial because it would have supported his claim that he was not running from the police. See id.

We conclude that the court did not abuse its discretion in concluding that the defendant's statement to the sergeants was proper material for cross-examination. One naturally would have included the exculpatory

details, as testified to during the defendant's direct examination, in his statement to the sergeants. The overall impression left by the defendant's trial testimony and his statement to the sergeants was that the two accounts were inconsistent and, as a result, the defendant's constitutional right to remain silent was not violated when the state cross-examined him on those inconsistencies.[11] See *State* v. *Alston*, supra, 272 Conn. 444.

## II

The defendant's second claim is that he was deprived of his constitutional right to present a defense because the court improperly allowed Smokes to avoid testifying by invoking his privilege against self-incrimination pursuant to the fifth and fourteenth amendments to the United States constitution. The defendant avers that he did not have the opportunity to voir dire Smokes and determine whether his testimony would have incriminated him. As a result, according to the defendant, the court improperly permitted a "blanket assertion" of the fifth amendment privilege. Furthermore, the defendant argues that Smokes did not have a valid right to invoke his fifth amendment privilege because the double jeopardy clause of the fifth amendment to the United States constitution, applicable to the states through the due process clause of the fourteenth amendment, prevented the state from bringing additional charges arising out of this incident against Smokes. We disagree and conclude that the court properly allowed Smokes to invoke his fifth amendment privilege and not testify. The following facts are necessary to the resolution of this claim.

The defendant sought to have Smokes testify as part of his defense. Tejas Bhatt, the attorney who represented Smokes, stated that he advised his client to invoke his privilege against self-incrimination and, as a result, not testify. Bhatt represented Smokes during the criminal prosecution stemming from the underlying events in the defendant's case. The result of that prosecution was that Smokes entered into a plea agreement with the state. As part of the agreement, the state entered a nolle prosequi on an assault charge.[12] Bhatt argued that, because the nolle prosequi was entered less than thirteen months from the time when Smokes was called to testify, the state could open the case and prosecute that charge. See *State* v. *Lloyd*, 185 Conn. 199, 201, 440 A.2d 867 (1981) ("[a]lthough the entry of a nolle prosequi results in the defendant's release from custody, he can, within thirteen months; General Statutes § 54-142a [c]; be tried again upon a new information and a new arrest"). Furthermore, Bhatt noted that Smokes never was charged with conspiracy to commit robbery, and, therefore, the possibility existed that he could be charged with that crime. The defendant argued that, as a result of the fifth amendment's prohibition on double jeopardy, Smokes' testimony was not incrimi-

nating and the court should order him to testify. The court allowed Smokes to invoke his fifth amendment privilege against self-incrimination and not testify because it concluded that there was a possibility that the state could open the assault case or charge him with conspiracy to commit robbery. On appeal, the defendant continues to claim that the prohibition on double jeopardy prevented the state from prosecuting the assault charge or charging Smokes with conspiracy to commit robbery and, therefore, the court should not have allowed him to invoke his fifth amendment privilege. We disagree.[13]

We begin with our standard of review. "A ruling on the validity of a witness' fifth amendment privilege is an evidentiary determination that this court will review under the abuse of discretion standard. As our Supreme Court has stated: It is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Mourning*, 104 Conn. App. 262, 276, 934 A.2d 263, cert. denied, 285 Conn. 903, 938 A.2d 594 (2007).

"A court may not deny a witness' invocation of the fifth amendment privilege against compelled self-incrimination unless it is *perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency to incriminate. . . . To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. . . . In appraising a fifth amendment claim by a witness, a judge must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence. . . . [T]he right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the *possibility* of prosecution. . . . [T]he trial court [is] . . . obligated to assess only whether a possibility of future prosecution [exists], or could arise, by virtue of the proffered testimony in light of existing law." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Keijam T.*, 226 Conn. 497, 503–504, 628 A.2d 562 (1993).

The defendant claims that there was no possibility that Smokes would be prosecuted on the basis of his testimony because the double jeopardy clause prohibited the state from charging him with conspiracy to commit robbery. "We have recognized that the Double Jeopardy Clauses consists of several protections . . .

[including the protection] against a second prosecution for the same offense after . . . conviction. . . . The traditional approach to analyzing whether two offenses constitute the same offense [for double jeopardy purposes] was set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Citations omitted; internal quotation marks omitted.) *State* v. *Alvarez*, 257 Conn. 782, 788–89, 778 A.2d 938 (2001).

Assuming, arguendo, that Smokes was charged with robbery in the first degree, larceny in the second degree, assault in the second degree, and possession of marijuana with intent to sell, as the defendant claims,[14] there still existed the possibility that he could be charged with conspiracy to commit robbery without violating the double jeopardy clause. We previously have held that robbery and conspiracy to commit robbery are separate offenses for purposes of double jeopardy because the conspiracy charge requires proof of an agreement and the robbery charge requires proof of an actual larceny. *State* v. *Fudge*, 20 Conn. App. 665, 669, 569 A.2d 1145, cert. denied, 214 Conn. 807, 573 A.2d 321 (1990).[15] As a result, there existed the possibility that Smokes could have been charged with conspiracy to commit robbery without violating the double jeopardy clause. We therefore conclude that the court did not abuse its discretion in allowing him to invoke his fifth amendment privilege against self-incrimination.[16]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] At trial, as well, the victim identified the defendant as the armed individual who stood by while Smokes assaulted him.

[3] The state established that the names and phone numbers for "Uncle Nate" and "Kyle" in the cell phone seized corresponded to the defendant's emergency contacts on file with the department of correction. The cell phone also contained phone numbers for "Grandma Luther" and "Smokes' Mom."

[4] A forensic science examiner with the state forensic science laboratory testified that the chances that an individual chosen at random could not be eliminated as a contributor to the partial DNA profile detected on the gun handle were one in 225,000 in the African-American population, one in ten million in the Caucasian population, and one in four million in the Hispanic population.

[5] The jury found the defendant not guilty of robbery in the first degree and conspiracy to commit robbery in the first degree.

[6] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in a significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. . . . He must be warned prior to any questioning that he has the right to remain silent . . . .").

[7] In response to the complaint, the sergeants previously had attempted to question the defendant, but he ended the interview because he wanted to meet with his attorney before providing a statement.

[8] The only record of the interview is a letter from one of the sergeants to a police captain documenting the results of the investigation. The letter

states that the interview could not be tape-recorded because it was conducted in a correctional facility.

[9] We find unpersuasive the defendant's arguments that he did not voluntarily waive his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant argues that the "meeting" with the sergeants was "administrative" and therefore did not constitute custodial interrogation. Alternatively, he cites *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1046, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983), in support of the argument that he "had not 'initiated' a conversation with the police in the fifth amendment sense because he made his intent clear that he was not willing to have a generalized discussion about the investigation of the charges against him."

To begin, it is not the defendant's characterization of the encounter that determines whether it was custodial interrogation for purposes of *Miranda*. See *Rhode Island* v. *Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) ("'interrogation' under *Miranda* refers . . . to any words or actions on the part of the police . . . that [they] should know are reasonably likely to elicit an incriminating response"). The interview rose to the level of an interrogation because, as the sergeants advised, there was a chance that the defendant might supply an incriminating response that could be used against him at trial. See id.; see also *Oregon* v. *Bradshaw*, supra, 462 U.S. 1046 (fact that officer considered exchange interrogation "is apparent from the fact that he immediately reminded the accused that '[y]ou do not have to talk to me,' and only after the accused told him that he 'understood' did they have a generalized conversation").

The defendant's reliance on *Oregon* v. *Bradshaw*, supra, 462 U.S. 1039, in support of his argument in the alternative, is misplaced. *Bradshaw* held that a defendant does not initiate a conversation with police by "merely [making] a necessary inquiry arising out of the incidents of the custodial relationship" by, for example, requesting a drink of water. Id., 1046. The defendant's civil complaint and the resulting interview were made voluntarily as part of his assertion of his constitutional rights and were not merely "necessary inquiries" arising out of a custodial relationship.

[10] The court in *State* v. *Watson*, supra, 251 Conn. 236, advised that whether an omission is inconsistent depends on the circumstances: "[S]ome persons may routinely avoid contact with law enforcement authorities out of an ingrained sense of fear or mistrust of officialdom . . . [and] some may remain silent because they were explicitly instructed to do so by the defendant's attorney. . . . These examples are, however, hardly exhaustive." (Internal quotation marks omitted.) The defendant never requested a hearing on the propriety of the state's cross-examining him on the basis of his statement to the sergeants. As a result, nothing resembling the fact-specific inquiry contemplated in *Watson* is in the record before this court.

[11] The defendant claims that it is fundamentally unfair to allow the state to impeach him on the basis of a prior inconsistent statement made during an interview to investigate police misconduct. He argues that this unfairness is underscored by the fact that the court prohibited the parties from telling the jury that the interview was part of an "internal affairs" investigation.

We do not intend to discourage arrestees from bringing civil complaints against the police. The fourth and fifth amendments to the United States constitution guarantee both the right to be free from unreasonable searches and seizures, and the right to remain silent. "[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons* v. *United States*, 390 U.S. 377, 394, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). The defendant, however, "[h]aving voluntarily taken the stand . . . was under an obligation to speak truthfully and accurately, and the [state] here did no more than to utilize the traditional truth-testing devices of the adversary process. . . . The shield provided by [*Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] cannot be perverted into a license to use perjury by way of a defense, free from all risk of confrontation with prior inconsistent utterances. The [defendant's] credibility was appropriately impeached by use of his earlier conflicting statements." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, supra, 163 Conn. 307–308 (defendant's testimony at motion to suppress hearing under fourth amendment found admissible at trial as prior inconsistent statement).

[12] "The state's right to terminate a prosecution by the entry of a nolle prosequi has its origins in practices recognized at common law. The effect of a nolle prosequi is to end pending proceedings without an acquittal and without placing the defendant in jeopardy." *State* v. *Lloyd*, 185 Conn. 199,

201, 440 A.2d 867 (1981).

[13] The defendant also claims that the court improperly allowed Smokes to invoke his fifth amendment privilege without an offer of proof to hear the specific questions that Smokes would have been asked. He asserts that a "blanket" assertion of Smokes' fifth amendment privilege was improper.

The record reflects that the defendant did not ask the court to conduct a voir dire of Smokes and did not object on the ground that a voir dire was not allowed. "It is axiomatic that appellants bear the burden to provide this court with an adequate record for review. . . . As we have noted, [s]peculation and conjecture have no place in appellate review. . . . Because defense counsel did not pursue further questioning or request an evidentiary hearing, it is impossible for this court to tell, without speculating, whether the trial court would have denied defense counsel an opportunity to voir dire such that it amounted to an acceptance of a blanket assertion of [the witness'] privilege." (Citations omitted; internal quotation marks omitted.) *State* v. *Mourning*, 104 Conn. App. 262, 274–75, 934 A.2d 263, cert. denied, 285 Conn. 903, 938 A.2d 594 (2007); cf. *State* v. *Cecarelli*, 32 Conn. App. 811, 817–18, 631 A.2d 862 (1993) (blanket assertion of fifth amendment privilege claim appropriate when "defendant objected, saying that a hearing . . . was 'absolutely essential' to determine if [the witness] would invoke the privilege and to assess whether the invocation was proper"). We therefore conclude that the record is inadequate to review this aspect of the defendant's claim.

[14] The defendant has not provided this court with support for the assertion that Smokes was charged with these crimes. He did provide a transcript of the proceeding during which Smokes pleaded guilty to larceny in the second degree and possession of marijuana with intent to sell. During that proceeding, the prosecutor stated, "[o]pen counts may be nolled," to which the trial court replied, "So noted." There is nothing before this court, however, that reflects what the "[o]pen counts" were. Attorney Bhatt asserted before the trial court that Smokes was not charged with conspiracy to commit robbery, and that assertion is not challenged on appeal.

[15] The defendant in *State* v. *Fudge*, supra, 20 Conn. App. 668–69, was charged with being an accessory to robbery in the first degree and conspiracy to commit robbery in the first degree. We noted: "It has long been the law of this state that there is no practical distinction in being labelled an accessory or a principal for the purpose of determining criminal responsibility. . . . Thus, the substantive crime with which the defendant was charged was robbery, and an agreement with another person is not an element of robbery." (Citation omitted.) Id., 670.

[16] The defendant also argues on appeal that, because the entries of nolle prosequi were part of Smokes' overall plea bargain agreement and jeopardy attached at sentencing, the nolle prosequis were essentially a dismissal of those charges and that it would violate the prohibition on double jeopardy to prosecute them within the aforementioned thirteen month period. We do not reach this claim in light of our conclusion that there was a possibility that Smokes could have been charged with conspiracy to commit robbery.