******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MICHAEL ROBERT PLACE
## (AC 34113)

DiPentima, C. J., and Alvord and Harper, Js.

*Argued May 19—officially released September 30, 2014*

(Appeal from Superior Court, judicial district of Windham, geographical area number eleven, Swords, J.)

*Allison M. Near*, assigned counsel, for the appellant (defendant).

*Nancy L. Walker*, special deputy assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Matthew A. Crockett*, assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Michael Robert Place, appeals from two separate judgments of conviction arising out of two robberies, one committed at an Xtra Mart convenience store in Putnam on July 17, 2008, and the other at a branch office of Putnam Bank on May 10, 2008. In docket number CR-08-0135945 (Xtra Mart case), the defendant appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3) and larceny in the sixth degree in violation of General Statutes § 53a-125b. He claims that the trial court erred in refusing him the opportunity to display his tattoos to the jury without being subject to cross-examination by the state, in violation of his right to due process and a fair trial.

The defendant also appeals from the judgment of conviction in docket number CR-09-137439 (Putnam Bank case), rendered after a jury trial, of larceny in the second degree in violation of General Statutes § 53a-123 and robbery in the second degree in violation of General Statutes § 53a-135 (a) (2). With respect to that judgment of conviction, the defendant claims that (1) the court erred in failing to admit into evidence a photographic array depicting someone who resembled the perpetrator, but who did not resemble the defendant, (2) the court improperly denied his motion to strike certain testimony from the state's witness, Dr. Angela Przech, a state forensic science examiner, who stated that the defendant had a prior conviction in Massachusetts, and (3) the prosecutor engaged in impropriety by eliciting testimony about the defendant's prior conviction in contravention of the court's pretrial orders. We affirm the judgments of the trial court.

The following procedural history is relevant to both appeals. The cases were tried separately, with the court, *Swords*, *J.*, presiding over both jury trials. In the Xtra Mart case, the jury found the defendant guilty of robbery in the first degree and larceny in the sixth degree. A different jury found the defendant guilty in the Putnam Bank case of larceny in the second degree and robbery in the second degree. It acquitted him of robbery in the first degree. On June 10, 2011, the court sentenced the defendant on both verdicts. In the Xtra Mart case, the court sentenced the defendant to twenty years incarceration on robbery in the first degree, which the court merged with the lesser included offense of larceny in the sixth degree. In the Putnam Bank case, the court sentenced the defendant to twenty years incarceration. The defendant received a total effective term of thirty years incarceration. This appeal followed.[1]

I

XTRA MART CASE

The jury reasonably could have found the following

facts. Daniel Hartman, the third shift night clerk at the Xtra Mart convenience store in Putnam, was working on July 17, 2008. At 1:20 a.m., he was in the bathroom gathering materials to mop the floor. When he heard someone enter the store, he left the bathroom and saw a Caucasian "[s]ix foot male, [with] dark hair, roughly a hundred and sixty to a hundred and seventy-five pounds, wearing gym shorts, [and] a T-shirt . . . . [T]he rest of his face was covered . . . [by] a T-shirt kind of turbaned around . . . his head and his face."[2] Almost immediately upon entering, however, the defendant told Hartman that "this is a . . . robbery." He demanded money and when Hartman told the defendant the money was in the cash register, he forced Hartman, with a knife pressed against the back of his neck, to retrieve the money. Within minutes, the defendant left with approximately one hundred and twenty-five dollars. Hartman then called the police, and the defendant was later arrested in connection with the crime.

In his testimony, Hartman did not describe the perpetrator as having any tattoos.[3] In addition, the lack of clarity in the state's surveillance video made it such that any tattoos on the perpetrator were not readily visible. It is undisputed that the defendant has two tattoos, one on his upper right arm and one between his thumb and forefinger on his left hand. The state entered into evidence photographs of those tattoos taken the day after the robbery.

At trial, the defendant wanted to emphasize the fact that, although he had visible tattoos on the day of the robbery, Hartman did not mention any tattoos in his description of the perpetrator. Defense counsel therefore informed the court that the defendant intended to display his tattoos to the jury, without testifying.[4] He argued that this was proper because the defendant would be exhibiting a static bodily condition and therefore he need not be put under oath or be subject to cross-examination by the state. The state objected, arguing: "It has been approximately two and [a] half years since this incident. The defendant has had the opportunity to alter or change the tattoo that he wants to display. . . . I would expect to ask him questions about whether he has altered it, what opportunities he's had to alter it, whether it has changed at all naturally."

After hearing both arguments and considering the nature of tattoos, their ability to be altered, and the length of time that had elapsed since the robbery, the court held: "[T]he state is legitimately entitled to ask him about the tattoos and its appearance today, and question him about any alterations between the time of the robbery and today, which is approximately two and [a] half years. . . . [T]he defendant would need to be under oath, and those questions and the answers to those questions call into question the defendant's credibility. So, if the defendant did get on the [witness]

stand, did display the tattoo, and the state chose to cross-examine him, then the state would also be permitted to use the robbery convictions[5] to impeach his credibility." (Footnote added.) On the basis of this ruling, the defendant chose not to display his tattoos and therefore was not subject to cross-examination by the state. The jury thereafter found the defendant guilty of robbery in the first degree and larceny in the sixth degree. This appeal followed.

The defendant claims that the court's ruling, requiring that he subject himself to cross-examination if he chose to display his tattoo to the jury, deprived him of his rights to due process and a fair trial.[6] We conclude that this constitutional claim must fail because the court properly precluded the defendant from displaying the tattoos to the jury in accordance with the rules of evidence. *State* v. *Annulli*, 309 Conn. 482, 490, 71 A.3d 530 (2013); see also *State* v. *Davis*, 298 Conn. 1, 10, 1 A.3d 76 (2010); *State* v. *Winot*, 294 Conn. 753, 775–76, 988 A.2d 188 (2010).

"In determining the relevancy and admissibility of evidence, trial courts have broad discretion. . . . Our standard of review of an evidentiary ruling is dependent on whether the claim is of constitutional magnitude. If the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Otherwise, in order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted; internal quotation marks omitted.) *State* v. *Swinton*, 268 Conn. 781, 797–98, 847 A.2d 921 (2004).

The defendant and the state disagree as to whether this claim is one of constitutional magnitude. The defendant states that "[s]ince the trial court would have only permitted the defendant to testify at the cost of relinquishing his fifth amendment right not to testify, this claim is of a constitutional magnitude." He supports his argument by citing *State* v. *Asherman*, 193 Conn. 695, 712–13, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), for the proposition that the state may compel a defendant to display a particular physical characteristic without violating the defendant's right against self-incrimination. He then compares that situation to the present, arguing that the defendant has the same right to display a physical characteristic without being subject to cross-examination. He concludes that the court erred in denying him such right, stating that the "court's insistence that [he] subject himself to cross-examination if he chose to display his tattoos contravened well settled law and deprived [him] of due process and a fair trial."

The state, however, argues that it "has found no Connecticut or United States Supreme Court decisions hold-

ing that a defendant is constitutionally entitled to exhibit bodily conditions without following the rules of evidence . . . . [E]ven the cases the defendant cites hold that a defendant must lay a proper evidentiary foundation before displaying tattoos or other physical characteristics."[7] We agree with the state. There is no established constitutional right to display a bodily condition without first laying a proper foundation. The defendant, therefore, has the burden of proving that the court abused its discretion in its evidentiary ruling and that it resulted in harm.

In attempting to carry this burden, the defendant claims that because the state put into evidence photographs of his tattoos, a proper evidentiary foundation was laid to display them to the jury. To the contrary, the state argues that the defendant failed to present evidence from any source that the tattoos on his body looked substantially the same as they did on the night of the robbery, two and one-half years earlier. Thus, according to the state, the court properly ruled that the defendant could not display his tattoos to the jury without laying a proper foundation. We agree with the state.

"An object connected with the commission of a crime must be shown to be in substantially the same condition as when the crime was committed before it can be properly admitted into evidence. . . . The court has broad discretion on this evidentiary issue, and its ruling may not be overturned on appellate review except for a clear abuse of discretion. . . . The [party offering the evidence has the] burden . . . [of] showing that it is reasonably probable that the substance has not been changed in important respects . . . . The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it." (Citations omitted; internal quotation marks omitted.) *State* v. *Green*, 55 Conn. App. 706, 713, 740 A.2d 450 (1999), cert. denied, 252 Conn. 920, 744 A.2d 438, cert. denied, 529 U.S. 1136, 120 S. Ct. 2019, 146 L. Ed. 2d 966 (2000).

The defendant claims that a proper foundation was laid for him to make a display to the jury because (1) the photographs the state entered into evidence depicted his tattoos the day after the robbery, and (2) Hartman did not testify that the perpetrator had any tattoos despite the fact that he "raised his right hand to bring the knife to . . . Hartman's face, which would have exposed the prominent tattoo on [his] right arm." He is mistaken. The defendant is required to show that it is reasonably probable that the substance of his tattoos had not been changed in important respects.[8] He failed to present any evidence that these tattoos had not been altered in the two and one-half years since the robbery, and therefore failed to meet the foundational requirements necessary for admitting such evidence.[9]

Accordingly, the court did not err in holding that the defendant could not take the witness stand to display his tattoos without being subject to cross-examination by the state.

## II

### PUTNAM BANK CASE

We now turn our attention to the defendant's appeal in the Putnam Bank case. The jury reasonably could have found the following facts. At about 4 p.m. on May 10, 2008, the defendant entered a Price Chopper supermarket in Putnam. Upon entering, the defendant walked past the checkout area and headed toward the Putnam Bank that was within the supermarket. He handed the bank teller, Beth Girard, a note demanding cash. Girard gave the defendant $200 "bait money" she was trained to do in the event of a robbery. The defendant, unsatisfied with the amount of money he received, stated, "this is not a . . . joke," and demanded more money, this time visibly showing a box cutter, wrapped in a tissue, that he held in his hand. Girard complied with the defendant's demand, and he left with approximately $2500 in cash. He left behind the demand note and the tissue, however, and these items were later sent to the state forensic laboratory.

After the state presented its evidence and the defense rested, the jury found the defendant guilty of larceny in the second degree and robbery in the second degree. This appeal followed.

### A

The defendant first argues that the court erred when it failed to admit into evidence a photographic array depicting someone who resembled the perpetrator, but who the defendant argues did not resemble him. Assuming that there was error, we conclude that it was harmless beyond a reasonable doubt.

The following additional facts are relevant to our review of the defendant's claim. At trial, Girard testified to a description of the perpetrator, explaining that he was a white male with an average build and brown hair, wearing a red sweatshirt and a green Boston Red Sox hat. She also testified on cross-examination that, a few weeks after the robbery, the police showed her a photographic array. She could not identify any one person as the perpetrator, but testified that she "was trying to give [the police] a better idea of what . . . his face looked like. [She] said one looked like the eyes of the robber [and] one had the facial feature." During Girard's testimony, the defendant asked the court to admit the photographic array as a full exhibit. The state objected to that admission, arguing that the photographic array was not relevant because Girard did not identify a particular person as the robber but identified a man with facial features similar to those of the perpetrator. Defense counsel responded that the photographic array

was relevant "to who [Girard] picked out as potentially being the robber, [the] type of face." After arguments, the court held that the photographic array was not relevant because it was "not a positive [identification] with respect to that individual as the perpetrator."

The standard with regard to evidentiary claims is well settled. "The trial court has wide discretion to determine the relevancy of evidence . . . . Thus, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling[s] [on these bases] . . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court . . . reasonably [could have] conclude[d] as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 11, 1 A.3d 76 (2010).

In the present case, we need not discuss whether the court abused its discretion in declining to admit the photographic array into evidence because any such error was harmless. The defendant claims that the court's failure to admit the photographic array resulted in a deprivation of his constitutional right to a fair trial because if the "jury had before it a photograph of an individual who resembled the perpetrator, and that individual bore no resemblance to the defendant, it could have had a significant impact on its verdict." Assuming, without deciding, that his constitutional claim has merit, we must determine whether that error was harmless.

"[T]he test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . In addition, [w]hen an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 420–21, 64 A.3d 91 (2013).

After reviewing the record, we conclude beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained and was therefore harmless. Despite the exclusion of the photographic array, the defendant elicited testimony to support his misidentification defense from Girard and Kimberly Bettencourt, the head teller who was working with Girard and witnessed the robbery. Girard admitted that she had given varying descriptions of the perpetrator, and Bettencourt testified to a description of the perpetrator that conflicted with the defendant's actual age

and some facial features. Excluding the photographic array, therefore, did not bar the defendant from presenting his defense theory. In fact, it was cumulative of other evidence of misidentification.

Furthermore, the record contains overwhelming evidence that it was the defendant who robbed Putnam Bank on May 10, 2008. As set forth in more detail in part II B of this opinion, the defendant could not be excluded as a contributor to the DNA found on the tissue that was left behind at the bank. Additionally, still shots from the surveillance footage from the bank were admitted into evidence, which gave the jury the opportunity to compare the perpetrator's features to that of the defendant. Other evidence included the demand note the perpetrator left behind at the bank, which had his palm print on it. The demand note was tested by John Pleckaitis, latent print examiner at the Department of Public Safety's division of scientific services forensic science laboratory. The demand note had more than thirty characteristics matching those of the defendant, and Pleckaitis therefore concluded that "the two impressions originated from the same source." Last, Dan Simonelli, an acquaintance of the defendant's, testified that the defendant came to his apartment on the day of the robbery in an attempt to buy drugs from a neighbor, but he was unable to do so because he did not have any money. He further testified that about fifteen or twenty minutes later, the defendant came back to his apartment with "a bunch of money," claiming that he "just cashed his tax return."

In reviewing this evidence, we conclude that if the court erred in declining to admit the photographic array into evidence, that error was harmless beyond a reasonable doubt. The defendant's constitutional claim thus fails.

### B

The defendant next argues that the court erred in denying his motion to strike allegedly prejudicial testimony from Przech, which he claims deprived him of a fair trial. We disagree.

The following facts are relevant to the resolution of this claim as well as the defendant's subsequent claim of prosecutorial impropriety. Prior to trial, the defendant filed a motion in limine to preclude the state from mentioning that he was on probation. The court granted the motion and instructed the state to inform its witnesses "that there shouldn't be any gratuitous mention of the defendant being on probation."

During trial, the state called Przech, a forensic science examiner at the state forensic laboratory. Przech testified during direct examination that her laboratory was responsible for determining the DNA composition on the tissue that the perpetrator held during the robbery and that was left behind at the bank. From that

testing, a DNA profile was developed. Przech testified that the DNA profile contained the DNA of two or more people. She then compared the profile to the defendant's DNA, where she found that the defendant "could not be eliminated as a contributor to the DNA profile," meaning that "there's not enough information to completely include . . . [his] DNA profile in that profile, but there's not enough information there . . . to eliminate [him]. So, there's genetic information that's there, but not all of it." Specifically, she testified that "[t]he expected frequency of individuals who could not be eliminated as a contributor to that profile is less than one in seven billion in the African-American population, is approximately one in 900 million in the Caucasian population, and approximately one in one billion in the Hispanic population," which means that there is an extremely small number of individuals who could not be eliminated from the profile.

On cross-examination, defense counsel probed Przech on issues beyond the DNA profile. He asked about her search in the state's database of DNA profiles of forensic samples and samples from convicted persons, CODIS, and which alleles[10] are used in that search. Przech testified that not every allele that is observed is entered into the database but, rather, she enters only those she determines would have investigative information. Defense counsel continued this line of questioning in an attempt to show that the process was subjective. Przech responded, however, that "our protocol and procedure is to put a profile into our database; a second person looks at it and agrees with the entry, and if those two people can't come to an agreement, it would go to the two CODIS . . . administrators . . . ." After extensive questioning on different aspects of her analysis, defense counsel focused his queries on the population that is used in comparing the defendant's DNA to the DNA profile. Przech answered that the laboratory generates a specific population from the world that is tested and published.

On redirect, the state sought to rebut the idea that the CODIS process was subjective and to clarify, for the jury, the role of CODIS and its purpose. Przech testified that "CODIS is a database of DNA profiles of forensic samples and convicted offender samples from . . . a Connecticut database and . . . a national database. . . . The purpose of the database is so that once you've generated a forensic profile, you can enter it into CODIS to search against other forensic profiles in the state or nationally . . . ." When the state asked the witness for her results in the present case, she testified that "[t]here was a database hit to a convicted offender in Massachusetts," and identified the defendant as that offender.

Defense counsel did not object during this testimony but, rather, conducted recross-examination of her. After

Przech and the jury were excused, defense counsel stated that the state's question elicited an improper response. He requested that the court strike the testimony that there "was a hit to a convicted offender in Massachusetts and that . . . was [the defendant]." He claimed that it was "in violation of the court's earlier rulings and an improper attempt to impeach [the defendant] before his taking the [witness] stand." He further contended, "I believe the testimony was clear that they said there was a hit to a convicted offender, [the defendant], in Massachusetts. I don't think that was appropriate, either question and answering, or answering. I'm not sure [the state] anticipated that result. I'm sure [the prosecutor] didn't mean to elicit that testimony, but it came out, and I don't think it was proper under the earlier rules of the court. . . . I would ask you to strike that testimony." The prosecutor responded: "[Defense] [c]ounsel opened the door to this whole discussion. Not a single time did [Przech] mention the CODIS word, the database word, at all in her testimony. Counsel brought it open, brought it up by talking about the database and CODIS and testing and CODIS as to this case. He opened the door. So, at this point the state has no other choice other than to ask . . . her what CODIS is and talk about the testing that was done in the case because he brought it up in his cross-examination. . . . I had no intention of going into this . . . area at all and I instructed . . . Przech not to mention any sort of thing to do with CODIS."

The court ruled that it was "not going to strike the testimony [be]cause . . . [defense counsel] did open the door on anything to do with CODIS. I think that [Przech's] answer that it came back as a hit to a convicted offender was completely unanticipated by [the prosecutor]. . . . I'm happy to instruct the jury that they should ignore that testimony . . . of the statement that he's a convicted offender and that they can't use that as part of their consideration as to whether or not he's guilty in this case. But, I mean, you already know . . . that it's going to highlight . . . that testimony . . . for the jury." Defense counsel then responded that he was "not [going to] ask for a jury instruction . . . ."[11]

"Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing

the prosecution to place the evidence in its proper context. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal. . . . We review for abuse of discretion the trial court's determination that a party has opened the door to otherwise inadmissible rebuttal evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Brown*, 309 Conn. 469, 479–80, 72 A.3d 48 (2013).

The defendant admitted in his brief that "[b]y his questioning, defense counsel was attempting to suggest that the [CODIS] process had a subjective element," but argued that "[t]he state's decision to use this as an opportunity to expose how the defendant's information ended up in that database was unnecessary, irrelevant, and elicited for the sole purpose of identifying the defendant as a convicted offender." We disagree. Defense counsel extensively questioned Przech about the process she employed in her preliminary search of CODIS, which included questions about the selected population that is used in comparing the defendant's DNA to the DNA profile. The defendant therefore opened the door to the state's follow-up questions about CODIS. The prosecutor was then able to clarify for the jury its use as an investigatory tool in identifying possible suspects through its database; a database that contained the profiles of convicted offenders. It was only through this questioning, and what the court found to be an unanticipated response by Przech, that the jury became aware of the fact that the defendant was a convicted offender in Massachusetts. Because defense counsel opened the door to the prosecutor's questions about CODIS, however, his line of questioning was permissible and Przech's response was not required to be stricken. "The defendant cannot reap the benefits of inquiry into one subject and expect the state's questioning within the same scope to be held impermissible." *State* v. *Brown*, 131 Conn. App. 275, 287–88, 26 A.3d 674 (2011), aff'd, 309 Conn. 469, 72 A.3d 48 (2013). Accordingly, the court did not abuse its discretion in denying the defendant's motion to strike.

C

Last, the defendant argues that the prosecutor engaged in prosecutorial impropriety when he elicited testimony from Przech that the defendant had been convicted of a crime in Massachusetts.[12] Specifically, he claims that the state violated the court's order to

exclude any reference to his being on probation. We do not agree.

We begin our analysis by setting forth the applicable law regarding claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

"To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 37, 975 A.2d 660 (2009).

Our previous conclusion that defense counsel opened the door to the prosecutor's questioning controls our conclusion as to this claim as well. We take the time to note, however, that the defendant's motion in limine, which the court granted, specifically and solely addressed the probationary status of the defendant. It did not foreclose the prosecutor from asking about the CODIS process and the databases that are used within that process. The prosecutor did not, therefore, violate the court's order by questioning Przech about CODIS and receiving an unanticipated response that referenced the defendant's criminal history in Massachusetts.[13] As a result, the prosecutor did not engage in prosecutorial impropriety.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] The defendant filed one appeal from the judgments of conviction, listing both docket numbers. Practice Book § 61-7.

[2] Hartman also testified that, from the brief instance in which he saw the "scruff" on the perpetrator's face, he believed the perpetrator was between forty and forty-five years of age.

[3] As the state notes, however, the defendant firmly placed his knife against the back of Hartman's neck and walked behind him. Moreover, the surveillance video depicted the perpetrator wearing a gray short sleeve shirt with white material extending below the sleeves of the gray shirt, obscuring the perpetrator's upper arms.

[4] The defendant believed that, despite photographs of his tattoos in evidence, the "actual publishing of his arm and his right arm and his left hand to the jury would be the best evidence of the tattoos that he had on the day this robbery allegedly occurred."

[5] According to the state, these included an armed robbery conviction in 2003, two unarmed robbery convictions in June and December, 1995, and two robbery convictions in July, 1985.

[6] We note that the defendant did not argue to the trial court that its ruling deprived him of the rights to due process and a fair trial. The defendant raised his constitutional argument for the first time in his appellate brief. It is a "bedrock principle of appellate jurisprudence that [reviewing courts] generally will not review unpreserved claims made for the first time on appeal." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 743, 91 A.3d 862 (2014). In *Elson*, our Supreme Court further stated, "We conclude, therefore, that to obtain review of an unpreserved claim pursuant to *State* v. *Golding*, [213 Conn. 233, 239–40, 567 A.2d 823 (1989)], a defendant need only raise that claim in his main brief, wherein he must present a record that is [adequate] for review and affirmatively [demonstrate] that his claim is indeed a violation of a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Elson*, supra, 754–55. We conclude that the defendant's brief satisfies the test set forth in *Elson* and therefore we will review his unpreserved constitutional claim.

[7] The defendant cites *Schmerber* v. *California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), arguing that the fifth amendment protects a defendant from being compelled to testify or provide the state with testimonial evidence. The present case is in stark contrast, however, because it was the defendant who wanted to display his tattoos, which was not asked for or compelled by the state.

The other cases cited by the defendant are from other jurisdictions, and are not the current state of the law in Connecticut. The only Connecticut case cited by the defendant, *State* v. *Sanchez*, 128 Conn. App. 1, 10 n.6, 15 A.3d 1182 (2010), aff'd, 308 Conn. 64, 60 A.3d 271 (2013), did not analyze whether the trial court erred in allowing the defendant to display his arm, in a nontestimonial manner, to show that he did not have a tattoo. Rather, the issue on appeal was whether the court erred in denying the defendant's motion to suppress evidence of a pretrial identification. Id., 6. This case cannot, therefore, be used to support the defendant's claim in the present appeal.

[8] Instead, defense counsel only stated that once the defendant was on the witness stand, the jury could "make its own determination as to whether or not the tattoos had been manipulated or changed in some manner." In his brief, the defendant also argues that "[e]ven if the tattoos had been altered in the intervening time period, it did not change the fact that the defendant had tattoos at the time of the robbery and the perpetrator, by [Hartman's] description, did not." Because the defendant is required to lay a proper foundation before such evidence can be admitted, these arguments are invalid.

[9] The defendant also argued before the trial court that the display of his tattoos is similar to a voice exemplar, which he claims is permitted in similar circumstances. However, in *State* v. *Watson*, 47 Conn. App. 794, 796, 707 A.2d 1278 (1998), aff'd, 251 Conn. 220, 740 A.2d 832 (1999), the defendant was involved in a robbery, in which the victims testified that the perpetrator was a Hispanic male who spoke broken English. During trial, the defendant wanted to give a voice exemplar, without appearing as a witness, to show that he did not have an accent. On appeal, this court held that the trial court did not abuse its discretion when it ruled that the defendant could not demonstrate his voice to the jury without appearing as a witness. Id., 808–809.

It stated that "the matter of whether an act is testimonial or not bears on whether a person may be compelled, consistent with his [f]ifth [a]mendment right to avoid self-incrimination, to perform that act; but the fact that exhibition of a physical characteristic is not testimonial in nature, and hence may be compelled at some stage, does not require its admissibility into evidence." (Internal quotation marks omitted.) Id., 809. This court therefore determined that the trial court had properly focused on whether the exemplar was reliable, not on whether it was testimonial. We similarly conclude that the trial court in the present case properly focused on the reliability and evidentiary basis for displaying the tattoo, rather than its nontestimonial nature.

[10] "An allele is defined as one or two or more alternative forms of a gene." (Internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 880 n.7, 776 A.2d 1091 (2001).

[11] The state first argues that the trial court "functionally granted the motion to strike when it offered to instruct the jury to ignore the testimony of a 'hit to a convicted offender' . . . and not rely on it in deliberations." It then states that when the defendant withdrew his request for a curative instruction, he essentially withdrew his motion to strike as well. As a result, the state claims that the defendant waived his right to pursue this issue on appeal. We disagree.

We read the court's ruling less broadly than the state does. After denying the motion to strike on the ground that defense counsel had opened the door as to the CODIS testimony, the court then offered to instruct the jury that it was not to consider the defendant's prior conviction in determining whether he was guilty in this case. We conclude that by declining the offer of curative instructions, the defendant did not waive his right to appeal from the court's denial of his motion to strike. Therefore, because the issue was properly preserved and not waived, we determine whether the court erred in denying the defendant's motion.

[12] The relevant facts are set forth in part II B of this opinion.

[13] In fact, defense counsel even stated that "I'm sure [the prosecutor] didn't mean to elicit that testimony . . . ."

---